## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CORDELLUS McMURTRY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-02176 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Cordellus McMurtry, an inmate, has glaucoma.  He received the diagnosis in May 2017, while incarcerated at Stateville Correctional Center.  But the diagnosis of a serious eye condition did not come out of the blue.  By that point, McMurtry had spent three years voicing concerns about delayed treatment for his vision problems.

In March 2018, McMurtry sued the prison's medical provider (Wexford), medical director, and two other prison officials under section 1983.  Almost two years later, in January 2020, he amended the complaint and added a claim against Jason Dunn, the optometrist.  He claims that all five defendants violated his Eighth Amendment rights by showing deliberate indifference to his medical needs.  He alleges that the delayed treatment caused him to develop glaucoma and worsened his condition.

Two defendants challenged the complaint.  Optometrist Dunn moved to dismiss based on the statute of limitations.  McMurtry was diagnosed with glaucoma in 2017, but did not sue Dunn until 2020, more than two years later.  Wexford Health Sources, Inc., Stateville's medical provider, moved for judgment on the pleadings.  Wexford argues that it cannot be liable because none of its current or former employees remains a defendant.

The Court grants Dunn's motion to dismiss and denies Wexford's motion for judgment on the pleadings.

**Background**

Cordellus McMurtry was diagnosed with glaucoma on May 19, 2017. *See* Am. Cplt., at ¶ 1 (Dckt. No. 71); *see also* UIC Diagnosis (Dckt. No. 71, at 19 of 74).[1] He claims that he developed the disease and suffered from deteriorating vision because of delayed appointments and a lack of proper care during his incarceration at Stateville. *See, e.g.*, Am. Cplt., at ¶ 1 ("Dr. Obaisi and his employer Wexford Health Source, Inc.['s] continual delay and lack of treatment has caused me to develope [sic] Glaucoma.").

McMurtry's main allegation is that his trip to an external specialist at the "U.I.C. Glaucoma Clinic"[2] was delayed for more than three years. *Id.* at ¶ 1. He also complains that he received deficient medical care from Jason Dunn, the Stateville optometrist, during on-site appointments at Stateville throughout that delay. *Id.* at ¶ 5.

The exhibits to the complaint describe medical care starting in December 2012, when Dunn initially referred McMurtry to a UIC eye specialist. *See* Medical Special Services Referral and Report (Dckt. No. 71, at 14 of 74). McMurtry does not describe this 2012 appointment in his complaint, but he mentions the fact that he saw Dunn before his visit to UIC in May 2013. *See* Am. Cplt., at ¶ 5 (Dckt. No. 71) (referring to Dunn's knowledge of McMurtry's eye pain and

---

[1] McMurtry attached 19 exhibits to his amended complaint, and cited the exhibits extensively in his pleading. The Court can consider exhibits to a complaint when deciding a motion to dismiss. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

[2] McMurtry's exhibits indicate that he was diagnosed at the UIC Eye and Ear Infirmary. *See* UIC Diagnosis (Dckt. No. 71, at 19 of 74); *see generally University of Illinois Hospital & Health Sciences System*, Wikipedia, https://en.wikipedia.org/wiki/University_of_Illinois_Hospital_%26_Health_Sciences_System (last visited March 26, 2021) ("[T]he UIC campus hosts the Lions of Illinois Eye Research Institute, the Light House for the Blind, and the Illinois Eye and Ear Infirmary (IEEI), making this a major statewide referral center for eye disease.").

headaches "prior too [sic] my visit to the U.I.C. specialist on May 23, 2013 and durning [sic] my visits with him afterwards").

Based on Dunn's referral, McMurtry visited the external specialist at UIC in May 2013. *Id.* At this appointment, the specialist diagnosed him as a "glaucoma suspect." *See* 5/23/13 UIC Report (Dckt. No. 71, at 15 of 74). Because of his "pre-existing eye pressure concern," the specialist recommended that he return to UIC for an appointment within six to 12 months. *See* Am. Cplt., at ¶ 1 (Dckt. No. 71).

Dr. Obaisi, the Stateville Medical Director, told McMurtry that he would return to UIC "soon." *Id.* But McMurtry waited "for months [and] months." *Id.* In the meantime, McMurtry frequently requested another exam at UIC. *Id.* ("I would ask Mr. Obaisi and other nurses, when am I returning to the U. of I. for my follow-up treatment. The nurses would tell me, they cannot tell me and Dr. Obaisi would reply soon or I told you soon so stop bothering me."). But McMurtry didn't return to UIC within the year, or within two years, or even three.

Throughout that time, he orally complained to Dr. Obaisi and filed grievances about the delay. *Id.* He complained of "sharp pain" in his eyes and headaches. *Id.* He asked to see an "on-site eye doctor," but discovered that Stateville didn't have one.[3] *Id.*

While he waited, McMurtry did attend several appointments with on-site optometrists, including Dunn. From October 2013 to June 2015, McMurtry visited Stateville's optometrist four times. *Id.* at ¶ 5. McMurtry complains that during two of the four appointments, he received inadequate care because Dunn did not check his eye pressure. *Id.* That testing, he

---

[3] As noted below, McMurtry does describe appointments with the "Stateville C.C. Optometrist" who he calls "Dr. Dunn." *See* Am. Cplt., at ¶ 5 (Dckt. No. 71). The complaint doesn't explain the discrepancy between the allegation that Stateville had no on-site eye doctor (*id.* at ¶ 1) and the allegation that Dunn was the on-site optometrist (*id.* at ¶ 5). Maybe McMurtry means that Stateville had no on-site ophthalmologist, but that he was able to see an on-site optometrist.

believes, could have helped diagnose his eye problems. "Measuring intraocular pressure" (or tonometry) is one of several tests used to diagnose glaucoma. *See generally Glaucoma – Diagnosis & treatment*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/glaucoma/diagnosis-treatment/drc-20372846 (last visited March 26, 2021).

The first of these appointments occurred in October 2013, five months after McMurtry's first visit to UIC. *See* Am. Cplt., at ¶ 5 (Dckt. No. 71). At that appointment, Dunn checked McMurtry's eye pressure and told him it "was on the high side." *Id.* So, during that first appointment, Dunn did check his eye pressure (unlike two later visits).

McMurtry next saw Dunn in April 2014. *Id.* He complained of eye pain, but Dunn did not check his eye pressure. *Id.*

During another appointment four months later, in August 2014, McMurtry told Dunn that he was having headaches. *Id.* Despite McMurtry's constant complaints of "sharp pain in [his] eyes and constant headaches" for more than a year, Dunn did not perform a pressure check at that visit, either, even though eye pain and headaches are symptoms of glaucoma. *Id.*; *see also Glaucoma – Symptoms & causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/glaucoma/symptoms-causes/syc-20372839 (last visited March 26, 2021). So despite the fact that McMurtry's pressure was on the high side at the first appointment, Dunn didn't check his eye pressure at the later appointments.

More months passed. The fourth appointment did not take place until June 1, 2015. *See* Am. Cplt., at ¶ 5 (Dckt. No. 71). At that point, McMurtry saw a different optometrist ("Nista"), who performed the next pressure check. *Id.* But the complaint does not include any information about the results of that test. And it does not mention Dunn, either.

Then, from July 2015 to October 2016, McMurtry received no follow-up care on-site or off-site. *See* Am. Cplt., at ¶ 1 (Dckt. No. 71) ("Dr. Obaisi knew I hadn't been seen by a [sic] eye-doctor from July 2015 to Oct. 2016, a 15-month period."); *id.* at ¶ 5 ("After my June 1, 2015 eye doctor visit, (I didn[']t see any eye doctor again until – Oct. 31, 2016) 15-month's later, ontop [sic] of an already 10-month failure of Dr. Dunn's not checking my eye pressure (That's a 25 month period) of failure to check my eye pressure!").

Eventually, he had three more on-site appointments in October 2016, December 2016, and February 2017. *Id.* at ¶ 5. The complaint does not mention which "eye doctor" treated him during those three appointments in 2016 and 2017. *Id.* The complaint gives no indication that Dunn treated him during any of those visits. *Id.* The exhibits to the complaint include a medical summary suggesting that McMurtry last saw Dunn in 2014, and saw a different optometrist in 2016 and 2017.[4]

The complaint alleges that he did not receive a pressure check during the appointments in December 2016 or February 2017. *Id.* ("After my visit on Oct. 31, 2016 I was seen again on the dates of 12/30/16 and 2/20/17 again my eye pressure was not checked on either visit . . . ."). The complaint is not entirely clear whether he received a pressure check during the appointment in October 2016.

In May 2017, four years after his first visit, McMurtry finally returned to UIC for an appointment. *Id.* At this appointment, the specialist diagnosed him with glaucoma. *Id.* at ¶ 1;

---

[4] In the exhibits to the amended complaint, McMurtry included a document summarizing his medical records. *See* Summary of UIC and Stateville Medical Records (Dckt. No. 71, at 40–50 of 74). The summary lists Dunn for three appointments: October 4, 2013, April 17, 2014, and August 5, 2014. *Id.* at 4 (Dckt. No. 71, at 43–44 of 74). The summary states that he saw a "New D.O." named Timothy S. Fahy at the 2016 and 2017 appointments, not Dunn. *Id.* at 4–5 (Dckt. No. 71, at 43–44 of 74).

*see also* UIC Diagnosis (Dckt. No. 71, at 19 of 74) (indicating that he was diagnosed at the UIC
Eye and Ear Infirmary on May 19, 2017).

Even after the glaucoma diagnosis, McMurtry endured more delayed appointments,
which made his condition worse. *See* Am. Cplt., at ¶ 1 (Dckt. No. 71). The UIC specialist
recommended that he return to the clinic two months after his diagnosis in May 2017. *Id.*
Instead, he did not return until November 3, 2017. *Id.* At that appointment, he "was prescribed a
second eye drop because [his] condition had grown worse during [sic] that 6-month delay." *Id.*

Throughout his difficulties obtaining treatment, McMurtry filed grievances with
Stateville. *Id.* McMurtry attached the grievances and responses as exhibits to the amended
complaint. He also attached letters that he wrote to prison officials. McMurtry alleges that he
filed "a total of (6)-six grievances to no avail, due to this continual violation since 2013." *Id.* at
¶ 4.

Four of the grievances related to his request to return to UIC. *See* 5/28/14 Grievance
(Dckt. No. 71, at 16 of 74); 5/25/15 Grievance (Dckt. No. 71, at 17–18 of 74); 10/29/16
Grievance (Dckt. No 71, at 28–29 of 74); 2/10/17 Grievance (Dckt. No. 71, at 34–35 of 74). One
later grievance requested an appointment with a neuro-ophthalmologist after his diagnosis, as the
specialist had recommended. *See* 7/21/17 Grievance (Dckt. No. 71, at 25 of 74). The final
grievance complained about the delays, the lack of proper care, and his worsening eye condition.
*See* 11/4/17 Grievance (Dckt. No. 71, at 38–39 of 74). The last grievance was returned as
misdirected, because it was filed with the Administrative Review Board prematurely, before
Pontiac Correctional Center (his facility at that time) had the chance to review the issue. *See*
Return of Grievance (Dckt. No. 71, at 37 of 74).

On March 19, 2018, McMurtry filed a pro se complaint against four defendants: (1) Wexford Health Sources, Inc.; (2) Dr. Obaisi, Wexford's Medical Director; (3) Stateville Warden Randy Pfister; and (4) grievance officer Anna McBee. Dr. Obaisi passed away before the filing of the amended complaint. He is no longer a defendant because there was no timely substitution.[5]

On January 22, 2020, McMurtry filed an amended complaint – also composed on his own – though by that time he had a court-appointed lawyer. *See* Am. Cplt. (Dckt. No. 71); *see also* 1/29/20 Minute Order (Dckt. No. 73). The amended complaint added Jason Dunn as a defendant. *See* Am. Cplt., at ¶ 5.

McMurtry claims that Dunn showed deliberate indifference to his medical needs by failing to perform pressure checks and by failing to address his complaints of eye pain and headaches. *Id.* ("Mr. Dunn should have known of the danger of not checking my eye pressure and of the risk he subjected me too [sic] by failing to do so."). Dunn's failure to check his eye pressure "fu[r]th[e]r exacerbat[ed]" his condition. *Id.*

At the end of the paragraph setting out his allegations against Dunn, McMurtry does mention his delayed return to UIC. *Id.* ("[I]t wasn[']t until May 19, 2017 when I was returned to U.I.C. 4-years after my May 23, 2013 visit which stated I should be returned in 6-12 months.").

---

[5] Judge Tharp, who presided over this case before reassignment, notified the parties of Dr. Obaisi's death on April 18, 2018. *See* 4/18/18 Order (Dckt. No. 11). McMurtry included Dr. Obaisi as a defendant in the original complaint in March 2018, and also named Dr. Obaisi as a defendant in his first amended complaint in January 2020. *See* Cplt., at ¶ 1 (Dckt. No. 1); Am. Cplt., at ¶ 1 (Dckt. No. 71). On July 1, 2020, McMurtry moved to substitute Dr. Obaisi's estate as a party. *See* Pl.'s Mtn. for Substitution (Dckt. No. 93). This Court denied the initial motion and the motion for reconsideration because of McMurtry's two-year delay in requesting the substitution, especially after Judge Tharp proactively flagged the issue. *See* 7/8/20 Mem. Opin. and Order (Dckt. No. 95); 7/31/20 Order (Dckt. No. 102). Even if one considers the filing of the amended complaint, the motion for substitution came too late. The motion for substitution (in July 2020) came long after the filing of the amended complaint, too (in January 2020). *See* Fed. R. Civ. P. 25(a)(1) (providing that an action against a decedent "must be dismissed" if a motion for substitution is not made "within 90 days after service of a statement noting the death").

But he doesn't connect that delay to Dunn anywhere in the complaint. *Id.* So the inadequate care during on-site appointments and its effect on his eye condition make up the entirety of his claim against Dunn.

As for Wexford, McMurtry alleges that its policies caused the delays that contributed to his glaucoma. *Id.* at ¶ 1. McMurtry claims that "Stateville has a well established pattern with failing to return patients to off-site specialist [sic] and with conducting follow-up care properly."[6] *Id.*

McMurtry believes that, because of financial incentives, Wexford has established policies and customs that are deliberately indifferent to the inmates' needs. *Id.* at ¶ 2. One such cost-saving measure, he says, is "to prevent outside consultations," even when doing so is contrary to a specialist's recommendations. *Id.* "Stateville's wholly inadequate medical care is the product of a continued pra[c]tice and custom promulgated by Wexford in an attempt to save money at the expense of inmates." *Id.*

### Discussion

Dunn moved to dismiss under Rule 12(b)(6). Wexford moved for judgment on the pleadings under Rule 12(c). The Court considers each motion in turn.

### I.      Dunn's Motion to Dismiss

Dunn moved to dismiss under Rule 12(b)(6) on three grounds. *See* Dunn's Mtn. to Dismiss, at 7–11 (Dckt. No. 79). First, he argues that the claim is untimely under the two-year statute of limitations. Second, he contends that the complaint fails to sufficiently plead

---

[6] The Court notes that McMurtry refers to Stateville here, rather than Wexford. But because Wexford is the medical provider for Stateville, and construing the complaint in the light most favorable to the plaintiff, this allegation appears intended to apply to Wexford, too.

deliberate indifference to medical needs. Third, he argues that he is entitled to Eleventh Amendment immunity on the official capacity claim.

The Court concludes that the claim is untimely. Because McMurtry's claim against Dunn is barred by the statute of limitations, the Court does not need to consider the second and third grounds for dismissal.

### A.    Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). At this early stage, the Court assumes the truth of the well-pleaded facts in the complaint, including the exhibits. *See Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). A court normally cannot consider evidence outside the pleadings on a motion to dismiss without converting it to a motion for summary judgment. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). But an exhibit to the complaint is deemed to be part of the complaint itself, so it is fair game on a motion to dismiss. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Finally, district courts "must . . . construe pro se complaints liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

The statute of limitations is an affirmative defense, so it typically is not a viable basis for challenging a complaint on a motion to dismiss. *See Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). But a complaint can defeat itself. A plaintiff can plead himself out of court on statute of limitations grounds if the face of the complaint shows that the claim is time-barred. *See, e.g., Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011)

("[W]hen the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim."); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010) ("[I]f it is plain from the complaint that the defense is indeed a bar to the suit dismissal is proper without further pleading."); *Cancer Found.*, 559 F.3d at 675 (recognizing that dismissal is appropriate when it is "clear from the face of the amended complaint that it is hopelessly time-barred"); *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (stating that "[a] statute of limitations defense, while not normally part of a motion under Rule 12(b)(6), is appropriate where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations") (internal quotations and citation omitted); *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief. If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense.") (citation omitted).

**B.  Timeliness of the Claim**

The statute of limitations for a claim under section 1983 depends on the statute of limitations for a personal injury action in the state where the injury occurred. *See Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016). Here, McMurtry was incarcerated in Illinois at all relevant times, so the Illinois statute of limitations controls. "In Illinois the statute of limitations for personal-injury actions is two years from when the cause of action accrued." *Id.* (citing 735 ILCS 5/13–202 (2016)).

10

McMurtry first named Dunn as a defendant on January 22, 2020. *See* Am. Cplt. (Dckt. No. 71). So the claim against Dunn is barred if the limitations period began to run more than two years before that date, subject to two exceptions (*i.e.,* tolling, and relation back). "Amended suits, which add new parties after the two-year period, are untimely and must be dismissed unless relation back applies or the running of the statute of limitations is tolled." *Terry v. Chicago Police Dep't*, 200 F. Supp. 3d 719, 724 (N.D. Ill. 2016).

The Court will address the timeliness of the claim in three steps. The first step is when the claim accrued. The second step is whether tolling applies. The final step is whether the filing of the amended complaint relates back to the filing of the original complaint. *See* Fed. R. Civ. P. 15(c)(1)(C)(ii).

## 1.    Accrual

When deciding whether a claim is timely, the first step is deciding when the claim accrued. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). The statute of limitations begins to run when the claim accrues. *Id.* So, once McMurtry's claim accrued, the two-year clock started ticking.

Dunn makes an accrual argument based on material outside the pleadings. He argues that the claim is untimely because he "stopped providing optometric services to prisoners, including Cordellus McMurtry" in November 2014, when he entered private practice. *See* Mtn. to Dismiss, at 5 (Dckt. No. 79). In his view, since he stopped caring for McMurtry more than five years before he became a defendant, the claim is untimely. *Id.* at 8.

Dunn might have a good argument on the merits, but a motion to dismiss is not the time or the place to inject material outside the pleadings. On a motion to dismiss, a complaint rises or

falls based on the contents of the complaint itself, not extraneous material. Challenging the merits of a claim based on other material is best reserved for a motion for summary judgment.

Next, Dunn argues that even if the limitations period started to run in 2017, the claim is still untimely. *See* Mtn. to Dismiss, at 8. That is, in his view, the face of the complaint shows that McMurtry's claims are time-barred. *Id.*

On a motion to dismiss, the Court must look to the allegations of the complaint to determine when the claim accrued. Again, the statute of limitations – borrowed from Illinois law – is two years. "Accrual, however, is governed by federal law." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517 (7th Cir. 2019). So state law determines the amount of time on the clock, and federal law determines when it starts to tick.

In deliberate indifference cases based on medical error, a section 1983 claim accrues "when the plaintiff knows of his physical injury and its cause." *Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2013); *see also King v. Newbold*, 815 F. App'x. 82, 85 (7th Cir. 2020). The plaintiff in *Devbrow* "allege[d] that the defendants were deliberately indifferent to his medical needs by unnecessarily delaying a biopsy and thus preventing the diagnosis of his prostate cancer until it had already spread to the bone." *Devbrow*, 705 F.3d at 769. "Devbrow learned of his injury and its cause when the disease was diagnosed." *Id.* The limitations period starts to run at the point of diagnosis, "even if the full extent or severity of the injury is not yet known." *Id.* at 768.

But when a plaintiff alleges a continuing violation, the claim can accrue after the injury is discovered. *Id.* at 768–69 ("In certain circumstances, the limitations period may commence *later* than the date of discovery . . . .") (emphasis in original). If a claim of deliberate indifference "does not necessarily allege a single event or a series of events, but . . . describe[s] an ongoing

12

denial of care . . . we have a continuing violation for accrual purposes." *Wilson*, 932 F.3d at 517

(citing *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)). "[T]he continuing-violation

doctrine operates to *delay* the start of the limitations period. A contrary rule, we explained

in *Heard,* would encourage the proliferation of protective lawsuits." *Devbrow*, 705 F.3d at 770

(emphasis in original; citing *Heard*, 253 F.3d at 319–20). "For continuing Eighth Amendment

violations, the two-year period starts to run (that is, the cause of action accrues) from the date of

the last incidence of that violation, not the first." *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir.

2013).

Heard is a good example of how a claim can accrue after discovery of an injury based on

a continuing violation. After complaining about pain for months, the inmate in *Heard* was

diagnosed with a ruptured hernia. *Heard*, 253 F.3d at 317. But the jail officials refused to act on

the recommendation for treatment. *Id.* The inmate did not receive any care until he left jail, and

he eventually sued within two years of the end of his incarceration. *Id.* at 317–18.

The Seventh Circuit held that the claim was timely. The lack of care after discovery of

the injury constituted a continuing violation that delayed the start of the statute of limitations. *Id.*

at 318–19. "Every day that they prolonged his agony by not treating his painful condition

marked a fresh infliction of punishment that caused the statute of limitations to start running

anew." *Id.* at 318; *see also Devbrow*, 705 F.3d at 770 ("*Heard* thus holds that when the violation

of the plaintiff's constitutional rights is a continuing one, the statute of limitations does not start

to run *any earlier* than the last day of the ongoing injury.") (emphasis in original).

Judge Easterbrook has noted that the term "continuing violation" has the "potential for

confusion" because it means different things in different situations. *Turley*, 729 F.3d at 654

(Easterbrook, J., concurring). A "genuine continuing violation" occurs when "[v]iolations begin

13

and continue, and the prevailing rule treats new acts, or ongoing inaction, as new violations." *Id.* Deliberate indifference cases under the Eighth Amendment are a good example, because "ongoing inaction" consists of a "failure to treat a significant painful medical condition." *Id.* As a result, "[t]he period of limitations runs from each independently unlawful act or failure to act." *Id.*

But where "[a] discrete wrongful act causes continuing harm," "a new discrete violation does not extend the time to sue about an old discrete violation, even if the new violation occurs while the injury from the old discrete violation continues." *Id.* That situation is not a continuing violation, but "should be labeled a continuing injury." *Id.* So a continuing injury doesn't delay accrual like a "genuine continuing violation."

McMurtry's claim against Dunn rests on Dunn's failure to check his eye pressure. *See* Am. Cplt., at ¶ 5 (Dckt. No. 71) ("Mr. Dunn should have known of the danger of not checking my eye pressure and of the risk he subjected me too [sic] by failing to do so."). McMurtry received a diagnosis of glaucoma on May 19, 2017. *See* UIC Diagnosis (Dckt. No. 71, at 19 of 74). That date is the latest possible date for the injury. At that point, McMurtry knew about the injury because he knew he had glaucoma.

But under *Devbrow* and *Heard*, the continuing violation doctrine could delay the start of the statute of limitations if the complaint alleged that Dunn failed to provide care after the diagnosis in May 2017. The lack of ongoing care would constitute ongoing inaction and thus be a "genuine continuing violation." *Turley*, 729 F.3d at 654 (Easterbrook, J., concurring).

But the complaint alleges no such thing. The complaint does not allege anything about Dunn after May 2017. In fact, all of the allegations about Dunn in the complaint pre-date the diagnosis of glaucoma. The claim against Dunn is about his failure to perform tests that could

have detected glaucoma, not his failure to provide treatment after the diagnosis of glaucoma. It is a pre-diagnosis claim, not a post-diagnosis claim.

Specifically, McMurtry alleges several eye appointments with Dunn spanning almost two years. *See* Am. Cplt., at ¶ 5 (Dckt. No. 71) (describing eye appointments with Dunn in October 2013, April 2014, and August 2014). In the same paragraph, McMurtry also describes four other on-site eye appointments from June 2015 to February 2017. *Id.* (describing eye appointments in June 2015, October 2016, December 2016, and February 2017). One appointment involved optometrist "Nista?" *Id.* The complaint does not reveal who provided treatment during the other three appointments during that period. *Id.*

The complaint does not allege that Dunn failed to act after the diagnosis of glaucoma in May 2017, so there is no basis to extend the accrual of the claim based on a continuing violation. The complaint does not allege that Dunn was continuing to do anything (or nothing) after May 2017.

McMurtry's claim accrued no later than the date of his glaucoma diagnosis. The date of diagnosis (May 19, 2017) is more than two years before the date of the amended complaint (January 22, 2020), when McMurtry sued Dunn for the first time. As a result, McMurtry's claim against Dunn is untimely unless the statute of limitations was tolled until January 2018 (that is, two years before he filed an amended complaint and added McMurtry in January 2020), or unless the amended complaint relates back to the original complaint filed on March 19, 2018.

### 2. Tolling

The next question is whether tolling applies. Accrual is about when the clock starts ticking, and tolling is about whether the clock was paused.

"Tolling interrupts the statute of limitations after it has begun to run . . . ." *Heard*, 253 F.3d at 317. Just as they apply state statutes of limitations to section 1983 claims, federal courts must also apply state tolling rules. *See Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001). So state law determines the amount of time on the clock, federal law determines when it starts to tick, and state law determines when the clock is paused.

Under Illinois law, limitations periods are tolled when "commencement of an action is stayed by injunction, order of a court, or *statutory prohibition*." 735 ILCS 5/13-216 (emphasis added). So "a federal court applying Illinois law must toll the statute of limitations if a 'statutory prohibition' exists that prevents a plaintiff's cause of action." *Johnson*, 272 F.3d at 521.

Here, a statutory prohibition was potentially available. When a prisoner sues under section 1983 about prison conditions, the PLRA requires him to exhaust administrative remedies before filing the claim. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").

A "federal court relying on the Illinois statute of limitations in a § 1983 case must toll the limitations period while a prisoner completes the administrative grievance process." *Johnson*, 272 F.3d at 522. Otherwise, a prisoner could face a heads-I-win, tails-you-lose situation. "The 'catch 22' in this case is self-evident: the prisoner who files suit under § 1983 prior to exhausting administrative remedies risks dismissal based upon § 1997e; whereas the prisoner who waits to exhaust his administrative remedies risks dismissal based upon untimeliness." *Id.* In short, pursuing administrative remedies can toll the statute of limitations.

16

McMurtry needs to bridge the gap between the accrual of the claim (in May 2017, when he was diagnosed) to the two-year mark before filing suit on January 22, 2020 (*i.e.,* January 22, 2018). McMurtry's claim would be timely if he had pursued administrative remedies against Dunn from the date of his diagnosis through January 22, 2018.

But tolling does not apply here for a simple reason: McMurtry did not pursue administrative remedies against Dunn at all. McMurtry attached his grievances, letters, and the responses to his grievances as exhibits to the complaint. *See* Exhibits to Am. Cplt. (Dckt. No. 71). But none of these grievances name Dunn, or complain of Dunn's or any other optometrist's failure to check his eye pressure.[7] *See Johnson*, 272 F.3d at 522 (noting that tolling applies "*while* a prisoner completes the administrative grievance process") (emphasis added).

In this suit, McMurtry's claim against Dunn rests solely on his failure to perform the pressure checks at several appointments. *See* Am. Cplt., at ¶ 5 (Dckt. No. 71). But none of his six grievances raised issues about the lack of pressure checks. *See* Exhibits to Am. Cplt. (Dckt. No. 71, at 16–18, 25, 28–29, 34–35, 38–39).

---

[7] "The PLRA does not specify what a prisoner must do to exhaust his administrative remedies. Those requirements are found in the law establishing the relevant administrative remedies: state law for state prisons and federal law for federal prisons." *Schillinger v. Kiley*, 954 F.3d 990, 995 (7th Cir. 2020). "Because Stateville is an Illinois Department of Corrections facility, its grievance procedure is governed by Illinois's Administrative Code." *See Lewis v. Pfister*, 2019 WL 5577164, at *1 (N.D. Ill. 2019); 20 Ill. Admin. Code § 504.800 (2017). The Administrative Code describes what information an inmate must include in a grievance:

> The grievance shall contain factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 Ill. Admin. Code § 504.810(c).

17

Four of the grievances involved his delayed return to UIC.  *See* 5/28/14 Grievance (Dckt. No. 71, at 16 of 74); 5/25/15 Grievance (Dckt. No. 71, at 17–18 of 74); 10/29/16 Grievance (Dckt. No 71, at 28–29 of 74); 2/10/17 Grievance (Dckt. No. 71, at 34–35 of 74).  One grievance, filed after his glaucoma diagnosis, requested an appointment with a neuro-ophthalmologist.  *See* 7/21/17 Grievance (Dckt. No. 71, at 25 of 74).  And his final grievance complained about his difficulties obtaining treatment from May 2013 to November 2017, summarizing the delays and their impact on his condition.  *See* 11/4/17 Grievance (Dckt. No. 71, at 38–39 of 74).

McMurtry's final grievance probably comes the closest.  In this grievance, McMurtry complained more generally about his medical care at Stateville.  He cited the delay in his return to UIC, the "non-treatment" since May 2013 that led to his diagnosis, and other failures by Wexford and Dr. Obaisi to properly treat his glaucoma following his diagnosis.  *Id.*  He concluded:  "Because of Dr. Obaisi and his employer Wexford Health Care Sources, Inc. and because of the continuing deliberate indifference displayed since May of 2013 thru May/November of 2017 I have developed a very serious eye condition 'Glaucoma.'"  *Id.*  Still, he never mentioned the lack of pressure checks and never raised any issues about Dunn's care.

Even if that grievance did apply to his claim against Dunn, and therefore tolled the limitations period, tolling would not apply beyond 2017.  That grievance was finally resolved on November 14, 2017, when the Administrative Review Board returned it as misdirected.  *See* Return of Grievance (Dckt. No. 71, at 37 of 74).  At that point, the clock was ticking.

From the face of the complaint and the exhibits, McMurtry did not pursue an administrative remedy against Dunn in the grievances, so there is no basis for tolling.  Even if, for the sake of argument, the last grievance complained about Dunn, the administrative process

18

for that grievance ended in November 2017. So, there was no tolling after November 2017. McMurtry sued Dunn more than two years later (in January 2020), so his claim is untimely.

McMurtry's claim against Dunn accrued in May 2017, and there is no basis for tolling. As a result, the claim is barred by the statute of limitations unless the amended complaint relates back to the original complaint.

### 3.    Relation Back

Sometimes an *untimely* claim can pass muster under the statute of limitations by latching onto a *timely* claim. Rule 15(c)(1) governs when an amended complaint adds a new defendant and relates back to the filing of an earlier complaint.

The first hurdle is a shared subject matter. "An amendment to a pleading relates back to the date of the original pleading when: . . . (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied . . . ." *See* Fed. R. Civ. P. 15(c)(1)(C). Rule 15(c)(1)(B) provides that the amendment must assert a claim arising out of the same "conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." *See* Fed. R. Civ. P. 15(c)(1)(B).

If an amended complaint passes that barrier, a plaintiff must overcome two additional hurdles. The new defendant must have "received such notice of the action that it will not be prejudiced in defending on the merits." *See* Fed. R. Civ. P. 15(c)(1)(C)(i). Next, the new complaint relates back if the new defendant "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *See* Fed. R. Civ. P. 15(c)(1)(C)(ii). Here, at a minimum, McMurtry has not satisfied the last requirement.

19

McMurtry argues that Dunn hasn't shown that he lacked notice of the lawsuit. *See* Pl.'s Resp. to Mtn. to Dismiss, at 7 (Dckt. No. 90). He largely relies on the Supreme Court's decision in *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538 (2010).

In *Krupski*, the Supreme Court considered relation back of an amended pleading that named a new party. *Id.* The Court "granted certiorari to resolve tension among the Circuits over the breadth of Rule 15(c)(1)(C)(ii)." *Id.* at 546.

The plaintiff in *Krupski* tripped and broke her leg on a cruise, and intended to sue the cruise line. *Id.* at 541–42. But she sued the wrong entity. Costa Cruise, the original defendant, was "merely the North American sales and marketing agent for Costa Crociere, which was the actual carrier and vessel operator." *Id.* at 543. By the time Krupski moved to amend the complaint to name the right defendant, the statute of limitations had run. *Id.* at 543–44. The Eleventh Circuit held that because Krupski knew, or should have known, about the existence of Costa Crociere (the new defendant) before the limitations period expired, her failure to name the entity was not a mistake but a deliberate choice. *Id.* at 546.

The Supreme Court reversed, explaining that Rule 15(c) places the focus on the new defendant's knowledge of a mistaken identity, not the plaintiff's knowledge. "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Id.* at 548 (emphasis in original).

A plaintiff's knowledge of a potential party's existence does not preclude a finding of mistake under Rule 15(c)(1)(C)(ii). "[A] plaintiff might know that the prospective defendant exists but nonetheless harbor a misunderstanding about his status or role in the events giving rise to the claim at issue, and she may mistakenly choose to sue a different defendant based on that

misimpression. That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied." *Id.* at 549. Because Krupski originally intended to sue the new defendant, but misunderstood its status, she made the type of mistake contemplated by Rule 15(c). *Id.*

*Krupski* did not dispense with the mistake requirement, which appears in the text of the Rule itself. Instead, the Supreme Court simply reminded lower courts that the proper focus is on the defendant's knowledge, not the plaintiff's knowledge, when it comes to the mistake. *Id.* at 548 ("Information in the plaintiff's possession is relevant only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity."). *Krupski* grounded its decision "in the text of the Rule," *id.* at 547, and the text of the Rule expressly requires a "mistake." *See* Fed. R. Civ. P. 15(c)(1)(C)(ii).

If anything, *Krupski* reinforced the notion that a mistake is a *sine qua non* of relation back under Rule 15. *See Krupski*, 560 U.S. at 548–49 (reviewing dictionary definitions of "mistake"). The Supreme Court repeatedly recognized the need for a "mistake," a "misunderstanding," a "misimpression." *Id.* at 549. The Supreme Court addressed *whose* knowledge of the mistake matters – the plaintiff's, or the new defendant's – without giving any indication that relation back could apply if there was no mistake at all.

In fact, the Supreme Court distinguished an earlier case (*Nelson*) because it involved no mistake. *Id.* at 551–52 ("In a footnote . . . we noted that the case did not arise under the 'mistake clause' of Rule 15(c): 'Respondent Adams made no such mistake. It knew of Nelson's role and existence and, until it moved to amend its pleading, chose to assert its claim for costs and fees only against [Nelson's company].'") (quoting *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 467 n.1 (2000)). The Court continued:

> In that case, there was nothing in the initial pleading suggesting that Nelson was an intended party, while there was evidence in the record (of which Nelson was aware) that Adams sought to add him only after learning that the company would not be able to satisfy the judgment. This evidence countered any implication that Adams had originally failed to name Nelson because of any "mistake concerning the proper party's identity," and instead suggested that Adams decided to name Nelson only after the fact in an attempt to ensure that the fee award would be paid.

*Id.* at 552 (citing *Nelson*, 529 U.S. at 463–64).

The Seventh Circuit confronted a similar case of corporate confusion in *Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555 (7th Cir. 2011). There, too, a plaintiff sued the wrong entity. *Id.* at 560. Relying on *Krupski*, the Seventh Circuit instructed district courts to focus on what the new defendant knew or should have known, and whether the new defendant suffered prejudice:

> The only two inquiries that the district court is now permitted to make in deciding whether an amended complaint relates back to the date of the original one are, first, whether the defendant who is sought to be added by the amendment knew or should have known that the plaintiff, had it not been for a mistake, would have sued him instead or in addition to suing the named defendant; and second, whether, even if so, the delay in the plaintiff's discovering his mistake impaired the new defendant's ability to defend himself.

*Id.* at 559–60.

*Krupski* ushered in a new interpretation of Rule 15 in this Circuit. "[T]he Supreme Court in *Krupski* . . . changed what we and other courts had understood, in *Hall* and the other cases we cited, to be the proper standard for deciding whether an amended complaint relates back . . . ." *Id.* at 559 (citation omitted). But the standard did not dispense with the threshold need for a "mistake," as commanded by the text of Rule 15(c)(1)(C)(ii).

Here, as in *Nelson*, there is no indication that McMurtry made a mistake in the original complaint by suing someone else instead of Dunn. In fact, as an exhibit to the original complaint, McMurtry attached a medical report listing Dunn as his optometrist. *See* Medical

22

Special Services Referral and Report (Dckt. No. 1, at 16 of 46) (bearing the printed name and signature of referring practitioner Jason Dunn). McMurtry knew that Dunn played a role in his care, but he advanced no claims against him. *See* Cplt. (Dckt. No. 1).

In response to Dunn's motion, McMurtry does not argue that he mistakenly sued another practitioner when he intended to sue Dunn. Indeed, the original complaint left little room for that argument. The amended complaint included the same four parties as the initial complaint, with the addition of Dunn as a fifth party. *Compare* Cplt. (Dckt. No. 1) (listing four defendants: Dr. Obaisi, Wexford Health Sources, Inc., Randy Pfister, and Anna McBee) *with* Am. Cplt. (Dckt. No. 71) (listing same four defendants and Jason Dunn). He didn't botch anyone's identity in the original complaint. He simply didn't sue everyone that he later wanted to sue.

The text of the Rule expressly requires a case of mistaken identity. Relation back applies only if the new defendant knew or should have known that he would have been sued "but for a mistake concerning the proper party's identity." *See* Fed. R. Civ. P. 15(c)(1)(C)(ii). Changing one's mind about who to sue – or making a tactical decision to expand the boundaries of the lawsuit to add new defendants – does not qualify as mistaken identity. "When the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met." *Krupski*, 560 U.S. at 552; *see also Pierce v. City of Chicago*, 2010 WL 4636676, at *4 (N.D. Ill. 2010) (holding that plaintiff who added "a new, third defendant" and did not conflate the identity of that defendant with another did not make any mistake akin to the misunderstanding in *Krupski*); *Hiler v. Extendicare Health Network, Inc.*, 2013 WL 756352,

at *6 (E.D. Ky. 2013) (rejecting relation back where plaintiff "foundationally fail[ed] to meet the 'mistake' predicate of Rule 15(c)," and merely sought "to expand the list of defendant targets").

The Rule requires knowledge of a mistake, that is, that the new defendant "knew or should have known" that he would have been sued "but for a mistake concerning the proper party's identity." *See* Fed. R. Civ. P. 15(c)(1)(C)(ii). Knowledge of a mistake presupposes the existence of a mistake. And not just any mistake – mistaken "*identity*." *Id.* (emphasis added). If there was no mistake, there was no way for a defendant to know about the mistake. The absence of a mistake compels the absence of relation back.

Here, there was no mistaken identity. McMurtry knew Dunn's name, and knew the role he played in his medical care when he composed his original complaint in 2018. He simply chose not to sue him. Nothing about this case suggests that it is a case of mistaken identity, like *Krupski* or *Joseph*.

Even if, for the sake of argument, there was a mistake, there is no basis for the notion that Dunn knew, or should have known, that McMurtry would have sued him but for a mistake. Relation back would require a finding that Dunn knew or should have known that McMurtry would have included him in the original complaint, absent mistaken identity. But the record is devoid of any basis to conclude that Dunn knew that McMurtry would have sued him but for a mistake. In fact, there is no reason to believe that Dunn even knew about the original complaint, let alone had reason to know that McMurtry mistakenly neglected to name him. *See Joseph*, 638 F.3d at 560 ("A potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose – unless it is or should be apparent to that person that he is the beneficiary of a mere slip of the pen, as it were.") (quoting *Rendall–Speranza v. Nassim,* 107 F.3d 913, 918 (D.C. Cir. 1997)).

McMurtry's claim against Dunn cannot be saved by relation back, so it is barred by the statute of limitations. Defendant Dunn's motion to dismiss is granted.

## II.     Wexford's Motion for Judgment on the Pleadings

Defendant Wexford moved for judgment on the pleadings under Rule 12(c). Wexford argues that it cannot be liable under section 1983 because none of its employees is a defendant.

### A.     Legal Standard

A party may move for judgment on the pleadings any time after the pleadings are closed. *See* Fed. R. Civ. P. 12(c); *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). The standard is the same as the standard for a motion to dismiss under Rule 12(b)(6). *See Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1092 (7th Cir. 2018). "To survive a motion for judgment on the pleadings, a complaint must state a claim to relief that is plausible on its face." *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020) (cleaned up).

The Court takes all well-pled facts as true. *See Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). And the Court "view[s] the facts in the complaint in the light most favorable to the nonmoving party and will grant the motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Denan*, 959 F.3d at 293 (cleaned up); *see also* 5C Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1368 (3d ed. 2020) ("[A]ll of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false."). Legal conclusions don't move the needle – the Court need not accept any legal assertions as true. *See Bishop v. Air Line Pilots Ass'n Int'l*, 900 F.3d 388, 397 (7th Cir. 2018); *see also Buchanan–Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

### B.      Section 1983 Liability for Private Corporations

Wexford believes that it can only be held liable under section 1983 if one of its employees is also a defendant.  *See* Mtn. for Judgment on the Pleadings, at 3 (Dckt. No. 96) ("Wexford cannot be held vicariously liable under *Monell* or *respondeat superior* if there is no underlying constitutional tort against one of its employees.").  This Court's dismissal of its former employee, Dr. Obaisi, Wexford argues, ended the case against it, too.  *Id.* at 4 ("Because there is no underlying constitutional claim against Dr. Obaisi, the Plaintiff cannot show that his alleged injury was the result of the corporation's official policy or widespread practice.").

Wexford basically argues that a section 1983 claim against a private corporation depends on vicarious liability.  That is, the liability of the entity depends on the liability of its employee.  The trouble is that, as Wexford acknowledges, vicarious liability is not the standard in this Circuit.  Instead, the Seventh Circuit applies the Supreme Court's *Monell* official policy standard to private corporations.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) ("[J]ust as a municipal corporation is not vicariously liable upon a theory of respondeat superior for the constitutional torts of its employees . . . a private corporation is not vicariously liable under [section] 1983 for its employees' deprivations of others' civil rights.") (citations omitted); *see also Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014) ("In a number of decisions since *Monell*, our court has applied the *Monell* standard to private corporations.").

*Monell* often acts as a shield from suit for private corporations whose employees have gone rogue and violated a third party's constitutional rights. *See, e.g.*, *Shields*, 746 F.3d at 794 ("Insulating private corporations from *respondeat superior* liability significantly reduces their incentives to control their employees' tortious behavior and to ensure respect for prisoners' rights."). Wexford's argument reverses that reasoning, insisting that without an underlying constitutional violation by one of its employees, it cannot be held liable. Under *Monell*, an entity is not liable simply because its agent is liable. And on the flipside, the fact that an agent is not liable does not mean that the entity is not liable.

In support of its argument, Wexford cites language from another case in which it was a defendant. "'There cannot be vicarious liability without primary liability. The individual defendants all prevailed in this suit, so there is no constitutional tort for which Wexford could be vicariously liable.'" *See* Mtn. for Judgment on the Pleadings, at 4 (Dckt. No. 96) (quoting *Montague v. Wexford Health Sources, Inc.*, 615 F. App'x. 378, 379 (7th Cir. 2015)).

But Wexford omits key context from that case. The quoted language is not an application of Seventh Circuit precedent. It's an explanation of the futility of plaintiff's argument that the Court overrule its precedent.

The plaintiff in that case advocated that the Seventh Circuit overrule its precedent applying *Monell* to private corporations. *See Montague*, 615 F. App'x. at 379. So instead of the official policy standard from *Monell*, the plaintiff was arguing for vicarious liability. But none of Wexford's employees remained as defendants in the case. *Id.* So the Court of Appeals explained that applying *respondeat superior* rather than *Monell* would not help the plaintiff, because vicarious liability requires primary liability. *Id.* The Court was not suggesting – as

27

Wexford does here – that under *Monell* a corporation can never be liable without primary liability.

*Monell* still governs private corporations in this Circuit, so Wexford's argument falls flat. Even if vicarious liability did apply, the Court of Appeals has observed that such liability would be in addition to, not instead of, *Monell* liability. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) ("We questioned in *Shields* whether private corporations might also be subject to *respondeat superior* liability, unlike their public counterparts, but we have no need in the present case to address that question and we thus leave it for another day.") (citing *Shields*, 746 F.3d at 790–92).

Most importantly, Wexford's argument runs headlong into the Seventh Circuit's decision in *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017). No individual employee defendants were left in the lawsuit, but the Seventh Circuit held that the medical provider could still be liable. The Seventh Circuit concluded that that case "well illustrates why an organization might be liable even if its individual agents are not." *Id.* at 378. "[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Id.*

Corporate liability under *Monell* need not depend on individual employee liability. "The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Id.* at 379. "Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Id.* As long as McMurtry has pled that an official policy, decision, or custom harmed him, no individual employee needs to be a party to the suit to hold Wexford liable.

The complaint brings a claim against Wexford based on its own practices, separate and apart from any misconduct of any employee. McMurtry alleges that Wexford "established an over all [sic] policy and custom to suit its own financial bottom line rather than afford proper medical care to its patients." *See* Am. Cplt., at ¶ 2 (Dckt. No. 71). He points to several delays in his return to UIC, even though the specialist had recommended a return within a year. *Id.* at ¶ 1. He alleges that Wexford "has a financial incentive to prevent outside consultations," and that this "failure to abide by the recommendations of a specialist by itself constitutes deliberate indifference." *Id.* at ¶ 2. And ultimately, these failures harmed him. *Id.* at ¶ 1.

Wexford moved for judgment on the pleadings based on its assumption that it could not be liable after the dismissal of Dr. Obaisi from the case. Seventh Circuit precedent says otherwise. Wexford's motion for judgment on the pleadings is denied.

### Conclusion

For these reasons, the Court grants Defendant Dunn's motion to dismiss. Defendant Dunn is dismissed. The Court denies Defendant Wexford's motion for judgment on the pleadings.

Date:   March 26, 2021

Steven C. Seeger
United States District Judge